1
2
3
4

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
JONATHAN USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3470

5   *Counsel for Plaintiff*

6   [Additional Counsel Appear on Signature Page]

7

8

9   UNITED STATES DISTRICT COURT
10   CENTRAL DISTRICT OF CALIFORNIA
    WESTERN DIVISION

11

| | |
|---|---|
| NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | Case No. 2:20-cv-01056 <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| MATTEL, INC., MARGARET H. GEORGIADIS, YNON KREIZ, JOSEPH J. EUTENEUER, and PRICEWATERHOUSECOOPERS LLP, | JURY TRIAL DEMANDED |
| Defendants. | |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff New Orleans Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (i) Mattel, Inc.'s ("Mattel" or the "Company") regulatory filings with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued and disseminated by the Company; (iii) analyst and media reports concerning Mattel; and (iv) other public information regarding the Company.

## I.   **INTRODUCTION**

1.      This securities class action is brought on behalf of purchasers of Mattel common stock between August 2, 2017 and August 8, 2019, inclusive (the "Class Period"). The claims asserted herein are alleged against Mattel, Margaret H. Georgiadis, Ynon Kreiz, Joseph J. Euteneuer, and PricewaterhouseCoopers LLP ("PwC") (collectively, "Defendants") and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      This matter arises from Defendants' material misrepresentations and omissions concerning Mattel's financial condition, the Company's internal control over financial reporting, and PwC's disqualifying conflicts of interest as Mattel's auditor.

3.      Specifically, Mattel misled investors concerning its financial condition and the effectiveness of its internal control over financial reporting including by understating its income tax expense by $109 million in the third quarter of 2017 and then by working with its auditor, PwC, to manipulate the Company's accounting to conceal this misstatement and avoid restating the Company's financial results. As one whistleblower recently revealed, the Company's senior accounting executives internally determined to conceal the errors in the Company's financial statements

because, by taking this approach, "at worst we might get a slap on the wrist from the Securities and Exchange Commission" but disclosing the truth and revealing a material weakness in internal controls would have been a "kiss of death." Throughout the Class Period, the Company misrepresented its financial condition and the effectiveness of Mattel's internal controls, including through false certifications that Georgiadis, Kreiz, and Euteneuer (collectively, "Individual Defendants") filed with the SEC during each quarter during the Class Period.

4.      Further, PwC issued audit opinions to accompany Mattel's annual reports stating that the Company's consolidated financial statements presented fairly, in all material respects, the financial position of the Company and that the Company's internal control over financial reporting was effective.

5.      The truth began to be revealed on August 8, 2019, when, after the close of trading, Mattel disclosed that it was made aware of an anonymous whistleblower letter and that, as a result, it was abruptly cancelling a $250 million debt offering scheduled to close that day.  In response to this news, Mattel's stock price fell from $13.43 per share on August 8, 2019, to $11.31 per share on August 9, 2019 on unusually high trading volume, a decline of over 15% in one trading day.

6.      Then, on October 29, 2019, the Company admitted that, following an investigation by its Audit Committee, it would be restating Mattel's financial reports for the third quarter 2017 and year-end 2017 and revising its financial reports for its previously issued 2016, 2017, and 2018 annual financial statements, and that the Company's internal control over financial reporting was not effective.  According to the results of the internal investigation, Mattel determined that "lapses in judgment by management contributed to these failures" and announced the resignation of Defendant CFO Euteneuer.

7.      Mattel also reported that its accounting errors were made based on "management's reliance on the accounting advice sought and received on the error from the lead audit engagement partner of Mattel's outside auditor," PwC.  PwC is

now facing an independence-related probe from the Public Company Accounting Oversight Board ("PCAOB"), an independent non-profit corporation established by Congress to oversee the audits of public companies, and the PwC partner who led the Mattel audit team was subsequently placed on administrative leave.

8.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of Mattel's stock, Plaintiff and other Class members have suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Mattel is headquartered in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   THE PARTIES

11.     Plaintiff New Orleans Employees' Retirement System is a pension system providing retirement benefits to public employees of the City of New Orleans.  As indicated on the certification submitted herewith, Plaintiff purchased shares of Mattel stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

12.     Defendant Mattel, a Delaware corporation headquartered in El Segundo, California, is a global toy-manufacturing conglomerate.  The Company's common stock trades on the NASDAQ, which is an efficient market, under ticker symbol "MAT."  Mattel currently has over 345 million shares of common stock outstanding, owned by at least hundreds or thousands of investors.

13.     Defendant Margaret H. Georgiadis was the Chief Executive Officer of Mattel from February 8, 2017 to April 19, 2018.

14.     Defendant Ynon Kreiz has served as the Chief Executive Officer of Mattel from April 19, 2018 to the present.

15.     Defendant Joseph J. Euteneuer was the Chief Financial Officer of Mattel from September 25, 2017 until it was announced on October 29, 2019 that he would be stepping down after a transition period of up to six months.

16.     Defendant PwC has been Mattel's independent registered accounting firm since 1974 and is responsible for auditing the Company's financial statements and internal control over financial reporting.

17.     The Individual Defendants, because of their positions with Mattel, possessed the power and authority to control the contents of Mattel's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.  **BACKGROUND**

18.    Mattel is a global toy-manufacturing conglomerate based in El Segundo, California.  Founded in 1945, Mattel is one of the world's largest toy companies and possesses a portfolio of toy brands and intellectual property including Barbie, Hot Wheels, and, through its 2011 acquisition of HIT Entertainment, Thomas & Friends.

19.    After reporting lower revenues every year since 2013, Mattel's financial results in the first half of 2017 again failed to meet analyst estimates, with second quarter revenue and earnings per share falling well below consensus expectations ($975 million and a loss of $0.14/share, respectively, compared to consensus estimates of $982 million and a loss of $0.09/share).

20.    Continuing weak sales and rising leverage prompted downgrades by Fitch Ratings and S&P Global Ratings in July 2017.  In addition, while Mattel had told investors that Mattel's licensed *Cars 3* toys offering would yield strong revenue growth, projecting a $300 million sales target following the June 2017 theatrical release of Disney's *Cars 3*, the early retail demand was running at the low end of internal expectations leading into the third quarter of 2017.  Further, as other toy lines (such as Thomas & Friends, American Girl, and Mega) experienced similarly depressed sales results, analysts began to question Mattel's ability to achieve even the "low single digit" revenue growth target for the year announced on June 14, 2017 in Mattel's Investor Day presentation.  Then, on September 19, 2017, major toy retailer Toys 'R' Us, which had long been one of Mattel's largest customers accounting for 15 to 20% of the Company's U.S. sales, declared bankruptcy.  This negative development further disrupted Mattel's business and earnings.  By the end of the third quarter on September 30, 2017, revenue had fallen 22% for North America sales compared to the prior year's third quarter, and international revenue was flat.

21.    Given these challenges, investors were intently focused on the Company's financial results, and in particular Mattel's reported net loss, which had risen significantly to $169.3 million in the first half 2017, up from $92.1 million in the same period in 2016, and ability to access the capital markets.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

22.    The Class Period begins on August 2, 2017, when Mattel filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q").

23.    The Q2 2017 Form 10-Q contained signed certifications by Defendant Georgiadis and outgoing-CFO Kevin M. Farr stating that to their knowledge the disclosure controls and procedures were designed by Defendant Georgiadis and Farr to ensure that material information was made known to them and to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with Generally Accepted Accounting Principles ("GAAP"). The certifications also stated that Defendant Georgiadis and Farr had disclosed to the Company's auditor and Audit Committee all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which were reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial information, and any fraud, whether or not material, that involved management or other employees who have a significant role in Mattel's internal control over financial reporting.

24.    The Q2 2017 Form 10-Q also stated under "Evaluation of Disclosure Controls and Procedures":

As of June 30, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer

and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2017.

25.    The statements in ¶¶23-24 were materially false and misleading. Specifically, these statements were materially false and misleading because: (i) Mattel's disclosure controls and procedures were ineffective and failed to provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; and (ii) Defendants Georgiadis and then-CFO Farr failed to disclose significant deficiencies and material weaknesses in the internal control over financial reporting.

26.    On September 21, 2017, Mattel filed a Form 8-K with the SEC summarizing and filing Amendment No. 2 (the "Amendment"), dated September 20, 2017, to the Seventh Amended and Restated Credit Agreement (the "Credit Facility").   The Amendment provided for loan concessions that lengthened the runway for Mattel, which was attempting to turn around its business after weak sales and rising leverage.

27.    The statements in ¶26 were materially false and misleading because Mattel failed to disclose that the loan concessions Mattel obtained were premised on inflated financial results that did not accurately reflect the Company's true financial and operational condition.

28.    On October 3, 2017, Mattel filed a Registration Statement and Prospectus with the SEC on Form S-3 ("Form S-3") for future offerings of debt, warrants, and other securities, signed by Defendants Georgiadis and Euteneuer.  In the Form S-3, Mattel incorporated by reference the positive evaluation of the effectiveness of internal control over financial reporting included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016 ("2016 Form 10-K") and the Q2 2017 Form 10-Q.

29.    The Form S-3 also contained a signed statement from PwC consenting to the incorporation by reference of their report relating to the effectiveness of internal control over financial reporting which was contained in the 2016 Form 10-K.

30.    The statements in ¶¶28-29 were materially false and misleading. Specifically, these statements were materially false and misleading because: (i) Mattel's disclosure controls and procedures were ineffective and failed to provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; and (ii) Defendants Georgiadis and Euteneuer failed to disclose significant deficiencies and material weaknesses in the internal control over financial reporting.

31.    On October 26, 2017, Mattel filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q").  The Q3 2017 Form 10-Q stated: "[I]n the third quarter Mattel established a valuation allowance on its U.S. federal and state deferred tax assets.  This results in a discrete charge to the quarter

of $561.9 million for the balance of these net deferred tax assets as of December 31, 2016."

32.     The Q3 2017 Form 10-Q further stated: "Net loss for the third quarter of 2017 was $603.2 million. . . .  [It] was negatively impacted by discrete non-cash tax expense of $561.9 million related to the establishment of a valuation allowance on deferred tax assets that will likely not be realized and lower gross profit."

33.     The Q3 2017 Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Georgiadis and Euteneuer stating that the financial information contained in the Q3 2017 Form 10-Q fairly presented, in all material respects, the operations and financial condition of the Company.

34.     The Q3 2017 Form 10-Q also contained certifications from Defendants Georgiadis and Euteneuer stating that to their knowledge the reports did not contain any untrue statement of a material fact or omission of a material fact necessary to make the statements made not misleading; that the financial statements fairly presented in all material respects the financial condition and operational results of the Company; that the disclosure controls and procedures were designed by Defendants Georgiadis and Euteneuer to ensure that material information was made known to them and to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; and that Defendants Georgiadis and Euteneuer had disclosed to the Company's auditor and Audit Committee all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which were reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial information, and any fraud, whether or not material, that involved management or other employees who have a significant role in the registrant's internal control over financial reporting.

35.     The Q3 2017 Form 10-Q also stated under "Evaluation of Disclosure Controls and Procedures":

> As of September 30, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2017.

36.     On February 27, 2018, Mattel filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the year ended December 31, 2017 (the "2017 Form 10-K"). In the 2017 Form 10-K, Mattel reported a net loss for the quarter ended December 31, 2017 ("Q4 2017") of $281.3 million.

37.     Mattel also stated in the 2017 Form 10-K, as it had stated in the Q3 2017 Form 10-K, that the "[n]et loss in the third quarter of 2017 included net discrete tax expense of $561.9 million, primarily related to the establishment of a valuation allowance."

38.     Like the Q3 2017 Form 10-Q, the 2017 Form 10-K contained signed certifications pursuant to SOX by Defendants Georgiadis and Euteneuer stating that

the financial information contained in the 2017 Form 10-K fairly presented, in all material respects, the operations and financial condition of the Company.

39.     The 2017 Form 10-K again contained certifications from Defendants Georgiadis and Euteneuer stating that to their knowledge the reports did not contain any untrue statement of a material fact or omission of a material fact necessary to make the statements made not misleading; that the financial statements fairly presented in all material respects the financial condition and operational results of the Company; that the disclosure controls and procedures were designed by Defendants Georgiadis and Euteneuer to ensure that material information was made known to them and to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; and that Defendants Georgiadis and Euteneuer had disclosed to the Company's auditor and Audit Committee all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which were reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial information, and any fraud, whether or not material, that involved management or other employees who have a significant role in the registrant's internal control over financial reporting.

40.     The 2017 Form 10-K also stated under "Evaluation of Disclosure Controls and Procedures":

As of December 31, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding

required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of December 31, 2017.

41.    In addition, the 2017 Form 10-K contained the Management's Report on Internal Control Over Financial Reporting, stating:

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)).   Mattel's management, including Margaret H. Georgiadis, its principal executive officer, and Joseph J. Euteneuer, its principal financial officer, evaluated the effectiveness of Mattel's internal control over financial reporting using the framework in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).   Based on this evaluation, management concluded that Mattel's internal control over financial reporting was effective as of December 31, 2017.   The effectiveness of the Company's internal control over financial reporting as of December 31, 2017 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

42.    The 2017 Form 10-K also contained a Report of Independent Registered Public Accounting Firm PwC, which stated:

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its

operations and its cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by the COSO.

. . .

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

43. The statements in ¶¶31-42 were materially false and misleading. Specifically, these statements were materially false and misleading because: (i) the Company's tax valuation allowance of $561.9 million as reported in the Q3 2017 Form 10-Q was understated by $109 million, wrongly offset by the valuation of the Company's Thomas & Friends asset through a mis-categorization of that asset; (ii) the Company's tax valuation allowance as reported in the 2017 Form 10-K was overstated by $109 million, as a result of the Company's coverup of the accounting error; (iii) the financial statements did not fairly present in all material respects the financial condition and operational results of the Company; (iv) Mattel's disclosure controls and procedures were ineffective and failed to provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; and (v) Defendants Georgiadis and Euteneuer failed to disclose significant deficiencies and material weaknesses in the internal control over financial reporting.

44.     Moreover, the statements in ¶¶36-42 were materially false and misleading because: (i) Defendants Mattel, Georgiadis, Euteneuer, and PwC failed to disclose the fact that sometime shortly after the start of 2018, the Company's director of tax reporting had identified and reported to senior management the material accounting error in the Company's tax valuation allowance; and (ii) Defendants Mattel, Georgiadis, Euteneuer, and PwC failed to disclose that Mattel's senior accounting team had worked together to cover up the material accounting error in the Company's tax valuation allowance.

45.     Mattel and its senior executives continued to misrepresent the effectiveness of the Company's internal control over financial reporting throughout the Class Period.  Specifically, on April 26, 2018, July 25, 2018, October 25, 2018, February 22, 2019, and April 26, 2019, the Company filed quarterly or annual reports on Forms 10-Q or Form 10-K that contained the same SOX certifications and evaluations of the Company's internal control over financial reporting.[1]

46.     In addition, in its annual report for the year ended December 31, 2018, which was filed with the SEC on Form 10-K ("2018 Form 10-K"), Mattel again included the Management's Report on Internal Control Over Financial Reporting.

47.     The 2018 Form 10-K also included the Report of Independent Registered Public Accounting Firm PwC affirming Mattel's internal control over financial reporting.

48.     The 2018 Form 10-K also contained quarterly financial data for the quarters ended September 30, 2017 ("Q3 2017") and December 31, 2017 ("Q4 2017") which repeated the same tax valuation allowance errors that had been contained in the Q3 2017 Form 10-Q and the 2017 Form 10-K.

---

[1] After Defendant Georgiadis stepped down on April 19, 2018, all subsequent SOX certifications and internal control statements were signed by Defendant Kreiz, who immediately replaced Georgiadis as CEO.

49.     The statements summarized in ¶¶45-48 were materially false and misleading because, in reality: (i) the Company's tax valuation allowance of $561.9 million as reported in the 2018 Form 10-K for Q3 2017 was understated by $109 million, wrongly offset by the valuation of the Company's Thomas & Friends asset through a mis-categorization of that asset; (ii) the Company's tax valuation allowance as reported in the 2018 Form 10-K for Q4 2017 was overstated by $109 million, as a result of the Company's coverup of the accounting error; (iii) the Company's financial statements did not fairly present in all material respects the financial condition and operational results of the Company; (iv) Mattel's disclosure controls and procedures were ineffective and failed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (v) Defendants Kreiz and Euteneuer did not disclose the significant deficiencies and material weaknesses in the internal control over financial reporting; (vi) Defendants Kreiz and Euteneuer failed to disclose the fact that the Company's director of tax reporting had identified and reported to senior management the tax valuation allowance accounting error; (vii) Defendants Mattel, Kreiz, Euteneuer, and PwC failed to disclose the fact that sometime shortly after the start of 2018, the Company's director of tax reporting had identified and reported to senior management the material accounting error in the Company's tax valuation allowance; and (viii) Defendants Mattel, Kreiz, Euteneuer, and PwC failed to disclose that Mattel's senior accounting team had worked together to cover up the material accounting error in the Company's tax valuation allowance.

## VI.   **THE TRUTH EMERGES**

50.     On August 8, 2019, after the close of trading, Mattel issued a press release, which it also filed on Form 8-K with the SEC, stating, "On August 6, 2019, Mattel . . . was made aware of an anonymous whistleblower letter.  To provide the Company with an opportunity to investigate the matters set forth in the letter, the offering of the Company's 6.00% Senior Notes due 2027 that was scheduled to close

on August 8, 2019 has been terminated."  Analysts immediately recognized the apparent credibility and seriousness of the allegations in the whistleblower letter, particularly given that it had prompted Mattel to cancel a $250 million debt offering on the day it was to close.  As an UBS analyst noted, "for Mattel management and the company's bankers to make a decision to pull out of the bond market, the issue at hand must have been important."

51.     In response to this news, Mattel's stock price fell from $13.43 per share on August 8, 2019, to $11.31 per share on August 9, 2019 on unusually high trading volume, a decline of over 15% in one trading day.

52.     Then, on October 29, 2019, Mattel issued a press release, also filed on Form 8-K with the SEC the next day, announcing that the Company's Audit Committee had concluded the internal investigation announced on August 8, 2019. Specifically, according to the Company, the whistleblower letter had been sent to Mattel's outside auditors and "questioned whether there were accounting errors in historical periods and whether Mattel's outside auditor was independent." According to the Company, the Audit Committee investigation determined that its income tax expense was understated by $109 million in Q3 2017 and overstated by $109 million in Q4 2017.  The investigation also determined that Mattel had "certain material weaknesses in its internal control over financial reporting."

53.     Mattel explained the accounting errors contained in its quarterly financial data for Q3 2017 and Q4 2017 as follows:

> Mattel's previously reported net loss of $603.3 million for the third quarter ended September 30, 2017 was understated by $109 million due to an error in calculating its tax valuation allowance.  The correct reported net loss for the quarter ended September 30, 2017 should have been a net loss of $712.3 million.  A change in accounting for an intangible asset in the fourth quarter of 2017 resulted in an effective correction of the error for the 2017 annual results.  However, the tax

expense remained uncorrected in the Q3 2017 Form 10-Q and was therefore overstated in the quarter ended December 31, 2017. As a result, Mattel's previously reported loss of $281.3 million for the quarter ended December 31, 2017 should have been reported as a net loss of $172.3 million.

54.     The Company also reported that the financial statements previously issued in its Q3 2017 Form 10-Q and 2017 Form 10-K "should no longer be relied upon due to material misstatements." Mattel also reported that it would be amending its 2018 Form 10-K to restate the quarterly financial results for Q3 2017 and Q4 2017 and restate the Management's Report on Internal Control over Financial Reporting. In addition, the Company reported that it would revise its previously issued 2018, 2017 and 2016 annual financial statements, as well as the financial information of certain quarters within 2018 and 2017 to correct for other misstatements. Mattel also reported that the financial statements for the three months ended March 31, 2019 and six months ended June 30, 2019 would be revised "prospectively," to correct for other misstatements.

55.     According to Mattel, the Company's misstatements were in part the result of "lapses in judgment by management," and the Company announced that CFO Joe Euteneuer would be leaving the Company.

56.     The Company also explained that its misstatements and omissions were made based on "management's reliance on the accounting advice sought and received on the error from the lead audit engagement partner of [PwC]."

57.     Finally, on November 6, 2019, *The Wall Street Journal* published a report detailing the account of a separate Mattel whistleblower, other than the one who had written the August 8, 2019 letter, who identified the tax valuation error and resigned in protest after senior Mattel executives refused to correct it. According to the whistleblower, Brett Whitaker, who was Mattel's director of tax reporting at the time, senior accounting executives at Mattel identified the error and believed it was

a material error that needed to be disclosed, but disclosing the error would have required Mattel to restate its financial data and admit to a weakness in internal control. Instead, the Company instead chose to cover up the accounting problem by changing the categorization of the Thomas & Friends asset. As Whitaker explained, "It was known within Mattel that if we took this approach [to conceal the error], at worst we might get a slap on the wrist from the Securities and Exchange Commission." However, if the Company disclosed a material weakness, "a senior executive said to me it would be 'the kiss of death.'"

58.     The *Wall Street Journal* article further described how Mattel's auditor PwC worked with Mattel to conceal the accounting misstatement. According to Whitaker, "A PwC partner told me that they were looking for a way to say this isn't a material weakness" and after the decision was made not to disclose the misstatement, a PwC tax partner was "walking down the hall, high-fiving people[.]" Following the Audit Committee investigation, the PwC partner who led the Mattel audit team was placed on administrative leave, and PwC is currently the subject of investigation by the PCAOB.

## VII.   LOSS CAUSATION

59.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. These misleading statements and omissions artificially inflated the price of Mattel stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, including on August 8, 2019, Mattel's stock price fell significantly. As a result of their purchases of Mattel stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## VIII.  <u>CLASS ACTION ALLEGATIONS</u>

60.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Mattel common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Mattel and their families and affiliates.

61.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Mattel has over 345 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

62.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants' statements and/or actions misrepresented material facts;

(c)     Whether Defendants' statements and/or actions omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements, actions, and/or omissions were false and misleading;

(e)     Whether Defendants' misconduct impacted the price of Mattel stock;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damages sustained by Class members and the appropriate measure of damages.

63.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

64.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

66.     Mattel's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

67.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Mattel who knew that the statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

## X.     PRESUMPTION OF RELIANCE

68.     At all relevant times, the market for Mattel stock was an efficient market for, among others, the following reasons:

(a)     Mattel stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Mattel filed periodic public reports with the SEC and the NASDAQ;

(c)     Mattel regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Mattel was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

69.     As a result of the foregoing, the market for Mattel stock promptly digested current information regarding Mattel from all publicly available sources and reflected such information in the price of Mattel stock.   Under these circumstances, all purchasers of Mattel stock during the Class Period suffered similar injury through their purchase of Mattel stock at artificially inflated prices and the presumption of reliance applies.

70.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material misstatements.  Because this action involves Defendants' misrepresenting material information regarding its net loss and internal control over financial reporting, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the misstatements be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the

importance of the Company's financial statements to investors, as set forth above, that requirement is satisfied here.

## XI.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder
(Against Mattel and the Individual Defendants)**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     During the Class Period, Mattel and the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Mattel stock at artificially inflated prices.

73.     Mattel and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     Mattel and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

75.     During the Class Period, Mattel and the Individual Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     Mattel and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.  Mattel and the Individual Defendants engaged in this misconduct to conceal Mattel's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

77.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Mattel stock at artificially inflated prices and were harmed when the truth about Mattel negatively impacted the price of the Company's stock.  Plaintiff and the Class would not have purchased Mattel stock at the prices they paid, or at all, had they been aware that the market prices for Mattel common stock had been artificially inflated by Mattel's and the Individual Defendants' fraudulent course of conduct.

78.     As a direct and proximate result of Mattel's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

79.     By virtue of the foregoing, Mattel and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder
<u>(Against PwC)</u>**

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     During the Class Period, PwC carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the

investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Mattel stock at artificially inflated prices.

82.     PwC: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  PwC is being sued as a primary participant in the wrongful and illegal conduct charged herein.

83.     In addition to the duties of full disclosure imposed on PwC as a result of making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, it had a duty to promptly disseminate truthful information that would be material to investors in accordance with the standards of the PCAOB so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information.

84.     PwC's statements concerning the Company's financial results and the effectiveness of internal controls, as alleged in ¶¶29, 42, and 47 above, were materially false and misleading.  PwC knew, or was reckless in not knowing, that Mattel's reported annual financial statements for 2017 and 2018, which were disseminated to the investing public, were materially misstated and included omissions of material fact that were not presented in accordance with GAAP, and that PwC's audits and/or reviews were not performed in accordance with PCAOB standards. Therefore, each of PwC's unqualified or "clean" audit reports concerning Mattel's misstated financial reports for 2017 and 2018 and Mattel's internal control over financial reporting—including the October 3, 2017 incorporation by reference,

with PwC's consent, of PwC's clean audit report concerning Mattel's 2016 annual financial statements—was materially false and misleading.

85.    As a result of PwC's clean audit opinions of Mattel's misstated financial reports for 2017 and 2018 and PwC's own false and misleading statements and omissions in its clean audit reports, the market price of the Company's publicly traded common stock was artificially inflated during the Class Period.  Had PwC not violated principles and standards of the PCAOB, it would have detected and reported the material weakness in Mattel's internal control over financial reporting and material misstatements in Mattel's reported tax valuation allowance for Q3 2017 and 2017.

86.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Mattel stock at artificially inflated prices and were harmed when the truth about Mattel negatively impacted the price of the Company's stock.  Plaintiff and the Class would not have purchased Mattel stock at the prices they paid, or at all, had they been aware that the market prices for Mattel common stock had been artificially inflated by PwC's fraudulent course of conduct.

87.    As a direct and proximate result of PwC's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

88.    By virtue of the foregoing, PwC violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III

### For Violations of Section 20(a) of the Exchange Act
### <u>(Against the Individual Defendants)</u>

89.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

90.    The Individual Defendants acted as controlling persons of Mattel within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-

level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Mattel, the Individual Defendants had the power and ability to control the actions of Mattel and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII.  <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated:  January 31, 2020                Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/  Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3470

-and-

Hannah Ross
Avi Josefson
Michael D. Blatchley
1251 Avenue of the Americas
New York, NY 10020
Tel:   (212) 554-1400
Fax:   (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com

*Counsel for Plaintiff*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Jesse Evans, Jr., on behalf the New Orleans Employees' Retirement System ("New Orleans"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Director of New Orleans. I have reviewed a complaint and authorize its filing in this matter.

2. New Orleans did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. New Orleans is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. New Orleans's transactions in the Mattel, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. New Orleans has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. New Orleans will not accept any payment for serving as a representative party on behalf of the Class beyond New Orleans's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31 day of January, 2020.

Jesse Evans, Jr.
Director
*New Orleans Employees' Retirement System*

**New Orleans Employees' Retirement System
Transactions in Mattel, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 9/26/2017 | 5,200 | $14.9588 |
| Purchase | 9/26/2017 | 1,300 | $14.9487 |
| Purchase | 9/27/2017 | 2,600 | $14.9733 |
| Purchase | 9/28/2017 | 1,500 | $14.9873 |
| Purchase | 10/5/2017 | 1,300 | $15.4904 |
| Purchase | 10/6/2017 | 1,300 | $15.4772 |
| Purchase | 10/10/2017 | 5,000 | $15.4450 |
| Purchase | 10/12/2017 | 1,000 | $15.5000 |
| Purchase | 10/17/2017 | 19,500 | $15.5500 |
| Purchase | 10/23/2017 | 17,194 | $15.4044 |
| Purchase | 10/23/2017 | 4,333 | $15.3906 |
| Purchase | 10/25/2017 | 5,200 | $15.2844 |
| Purchase | 10/26/2017 | 1,500 | $13.0000 |
| Purchase | 10/27/2017 | 3,000 | $12.9355 |
| Purchase | 10/27/2017 | 1,000 | $13.1564 |
| Purchase | 10/27/2017 | 13,000 | $13.3641 |
| Purchase | 10/27/2017 | 1,000 | $13.5600 |
| Purchase | 10/27/2017 | 6,000 | $12.9360 |
| Purchase | 10/31/2017 | 1,400 | $14.1594 |
| Purchase | 10/31/2017 | 1,067 | $14.1657 |
| Purchase | 9/24/2018 | 900 | $15.9731 |
| Purchase | 9/24/2018 | 1,800 | $15.9913 |
| Purchase | 9/24/2018 | 5,400 | $15.9655 |
| Purchase | 9/25/2018 | 2,700 | $16.0460 |
| Purchase | 9/26/2018 | 2,700 | $16.0024 |
| Purchase | 9/27/2018 | 3,704 | $15.9875 |
| Purchase | 10/12/2018 | 2,769 | $14.2000 |
| Purchase | 10/12/2018 | 2,262 | $14.3090 |
| Purchase | 10/12/2018 | 197 | $14.3150 |
| Purchase | 12/17/2018 | 5,000 | $11.1354 |
| Purchase | 12/17/2018 | 1,000 | $10.9534 |
| Purchase | 12/18/2018 | 7,000 | $10.9690 |
| Purchase | 12/18/2018 | 1,000 | $11.0750 |
| Purchase | 12/18/2018 | 1,346 | $10.9700 |
| Sale | 2/12/2019 | (1,800) | $16.7241 |
| Sale | 2/12/2019 | (900) | $16.7735 |
| Sale | 2/12/2019 | (9,000) | $16.7111 |